IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA**,
   *Plaintiff,*

v.            Case No. **15-10150-01, 02 JTM**

**SHANE COX, and
JEREMY KETTLER**,
   *Defendants.*

---

**DEFENDANT'S MOTION TO DISMISS PROSECUTION
AS KANSAS' SECOND AMENDMENT PROTECTION ACT
ENCOMPASSES A RIGHT NOT DELEGATED TO THE UNITED STATES,
BUT RESERVED TO THE STATE UNDER THEIR GENERAL POLICE
POWERS, CONSISTENT WITH TENTH AMENDMENT PRINCIPLES**

---

The defendant, Shane Cox, by and through his attorneys, Steven K. Gradert and Timothy J. Henry, Assistant Federal Public Defenders for the District of Kansas, moves this Court to dismiss the present prosecution on constitutional grounds under the Tenth Amendment to the United States Constitution as the Kansas Second Amendment Protection Act (SAPA) directly conflicts with federal law precluding the present federal prosecution. On behalf of this Motion, defense counsel state as follows:

BACKGROUND

Defendant Shane Cox is charged with five counts of transferring a firearm requiring registration (silencer) (counts 6-9, 11), three counts of possessing a firearm requiring registration (two destructive devices and a short-barrelled rifle) (counts 2-4), one count of making a firearm requiring registration (silencer) (count 10), and with engaging in a business dealing in firearms requiring registration without having paid

the occupational tax (count 12). These alleged offenses are proscribed in Title 26, the Internal Revenue Code, at §§ 5861(e), (d), (f) and (a), respectively. They are punishable by a term of imprisonment up to ten years per count. 26 U.S.C. § 5871.

This Court has previously ruled that 26 U.S.C. § 5861 was a valid exercise of Congress' taxing authority under Article I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, . . ."). *See* Dkt. # 34, pp. 4-8. Further, it held the Kansas Second Amendment Protection Act (SAPA) did not provide an equitable estoppel defense as Kansas officials are not responsible for interpreting or enforcing a federal statute. *Id.* p. 9.

These earlier defense motions to dismiss did not directly address the issue, raised here, that calls into question whether the federal government's authority to prosecute this case violates the Tenth Amendment to the United States Constitution. Although the Tenth Amendment was referenced at one point in defense counsel's motion to dismiss, that motion argued that the present prosecution was an unconstitutional exercise of Congress' power to tax.

ARGUMENT

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 132 S. Ct. 2566, 2577, 183 L.Ed.2d 450 (2012). It has long been known that the police powers are not an "enumerated" power given to the federal government, but a power "reserved" for the States. *See e.g., Hodel v. Virginia Surface Mining &*

2

*Reclamation Ass'n,* 452 U.S. 264, 311 (1981) (Rehnquist, J., concurring) ("[U]nlike the reserved police powers of the States, which are plenary unless challenged as violating some specific provision of the Constitution, the connection with interstate commerce is itself a jurisdictional prerequisite for any substantive legislation by Congress under the Commerce Clause.").

Although the Court has previously ruled that Title 26, U.S.C. § 5861 and § 5871 (criminal penalty provision) are a constitutional exercise of Congress' power to tax, this motion challenges that ruling where the applicable provisions of Chapter 53 of the Internal Revenue Code lose their character as a taxing provision, and become merely regulatory punishment needing other enumerated authority.

> Congress's ability to use its taxing power to influence conduct is not without limits. A few of our cases policed these limits aggressively, invalidating punitive exactions obviously designed to regulate behavior otherwise regarded at the time as beyond federal authority. See, *e.g., United States v. Butler,* 297 U.S. 1, 56 S. Ct. 312, 80 L.Ed. 477 (1936); *Drexel Furniture,* 259 U.S. 20, 42 S. Ct. 449, 66 L.Ed. 817. More often and more recently we have declined to closely examine the regulatory motive or effect of revenue-raising measures. See *Kahriger,* 345 U.S., at 27–31, 73 S. Ct. 510 (collecting cases). **We have nonetheless maintained that "'there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment.'"** *2600 *Kurth Ranch,* 511 U.S., at 779, 114 S. Ct. 1937 (quoting *Drexel Furniture, supra,* at 38, 42 S. Ct. 449).

*Nat'l Fed'n of Indep. Bus.,* 132 S. Ct. at 2599-2600 (emphasis supplied). That is precisely what has occurred under these particular provisions of the Internal Revenue Code. Defense counsel submit this prosecution cannot stand on Congress'

taxing authority and must, therefore, find its enumerated authority elsewhere. Counsel will not reiterate the arguments previously contained in Cox's motion to dismiss (Dkt. # 29), but would incorporate them here if this Court were to find it was unable to rely on Congress' taxing authority.

In fact, when deciding whether the Patient Protection and Affordable Care Act (PPACA) was constitutional under Congress' taxing authority, the Supreme Court discussed the constitutional relationship between the separate State and Federal sovereigns when discussing the Spending Clause.

> At the same time, our cases have recognized limits on Congress's power under the Spending Clause to secure state compliance with federal objectives. "We have repeatedly characterized ... Spending Clause legislation as 'much in the nature of a *contract*.'" *Barnes v. Gorman,* 536 U.S. 181, 186, 122 S. Ct. 2097, 153 L.Ed.2d 230 (2002) (quoting *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L.Ed.2d 694 (1981)). **The legitimacy of Congress's exercise of the spending power "thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'"** *Pennhurst, supra,* **at 17, 101 S. Ct. 1531. Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system.** . . .
>
> **That insight has led this Court to strike down federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes**. See, *e.g., Printz,* 521 U.S., at 933, 117 S. Ct. 2365 (striking down federal legislation compelling state law enforcement officers to perform federally mandated background checks on handgun purchasers); *New York, supra,* at 174–175, 112 S. Ct. 2408 (invalidating provisions of an Act that would compel a State to either take title to nuclear waste or enact particular state waste regulations).

*Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2602 (emphasis supplied). Although the anti-commandeering principles have routinely been employed where the federal

4

government passes regulatory legislation that requires States to follow it in some form, federal government compulsion or overreach can come in many forms, including the prohibition of State action. Here, the anti-commandeering principle this Court should find is to preclude the federal government from essentially repealing a State law.

Here, the State of Kansas, through its elected representatives, passed a series of laws commonly known as the Second Amendment Protection Act (SAPA). K.S.A. §§ 50-1201 *et seq.* These laws are very clear as to their intent. "Any act, law, treaty, order, rule or regulation of the government of the United States which violates the second amendment to the constitution of the United States **is null and void and unenforceable in the State of Kansas**." K.S.A. § 50-1206(a) (emphasis supplied). Likewise, any firearm or accessory made in Kansas and remaining in Kansas is "not subject to **any federal law**, treaty, **federal regulation, or federal executive action, including any federal firearm or ammunition registration program**." K.S.A. § 50-1204(a) (emphasis supplied).

As Chief Justice Roberts initially pointed out in *Nat'l Fed'n of Indep. Bus.*,

> Nearly two centuries ago, Chief Justice Marshall observed that "the question respecting the extent of the powers actually granted" to the Federal Government "**is perpetually arising, and will probably continue to arise, as long as our system shall exist**." *McCulloch v. Maryland,* 4 Wheat. 316, 405, 4 L.Ed. 579 (1819). In this case we must again determine whether the Constitution grants Congress powers it now asserts, but which many States and individuals believe it does not possess. Resolving this controversy requires us to examine both the limits of the Government's power, and our own limited role in policing those boundaries.

*Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2577 (emphasis supplied). We find ourselves at this crossroad again. Where, as here, the State of Kansas has so clearly spoken on this subject, the present prosecution directly conflicts with the State of Kansas's general policing powers that are reserved under the Tenth Amendment to the States.

Here, the actions by the federal government, in direct contravention of the intent of a sovereign State, have invaded an area of the law that has traditionally been reserved to the States. As argued above and in Cox's initial motion to dismiss, where the federal government cannot rely on its taxing authority in what is clearly a criminal matter with criminal penalties higher than even those reserved for felons due to the nature of the firearms,[1] continuing to prosecute this case in the federal courts amounts to a form of compulsion or indirect coercion contrary to the Tenth Amendment.

> But when "pressure turns into compulsion," *ibid.,* the legislation runs contrary to our system of federalism. "[T]he Constitution simply does not give Congress the authority to require the States to regulate." *New York,* 505 U.S., at 178, 112 S. Ct. 2408. That is true whether Congress directly commands a State to regulate **or indirectly coerces a State to adopt a federal regulatory system as its own.**
>
> Permitting the Federal Government to force the States to implement a federal program would threaten the political accountability key to our federal system. "[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *Id.,* at 169, 112 S. Ct. 2408. Spending Clause programs do not

---

[1] Under U.S.S.G. § 2K2.1(a)(5), if convicted, Shane Cox would have a base offense level of 18, as opposed to a prohibited person, such as a felon, whose base offense level is 14 under § 2K2.1(a)(6).

>   pose this danger when a State has a legitimate choice whether to accept the federal conditions in exchange for federal *2603 funds. In such a situation, state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer. But when the State has no choice, the Federal Government can achieve its objectives without accountability, just as in *New York* and *Printz*. Indeed, this danger is heightened when Congress acts under the Spending Clause, because Congress can use that power to implement federal policy it could not impose directly under its enumerated powers.

*Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. at 2602–03.

In the above discussion over the interplay of the Spending Clause between the Federal and State sovereigns, a critical factor was the ability of the State sovereign to choose whether to permit federal intervention. As Chief Justice Roberts said, "The State are separate and independent sovereigns. Sometimes they have to act like it." *Id.* at 2603. Here, the State of Kansas did act like an independent sovereign. By passing SAPA, they stated they didn't want their citizens prosecuted federally for behavior that Mr. Cox has readily admitted he did due to his reliance on SAPA.

The fact that the State of Kansas Attorney General has intervened in this case establishes this point very clearly. Because this Motion relies on SAPA and centers on the struggle between the separate sovereigns under the Tenth Amendment in challenging the constitutionality of this prosecution, the State of Kansas would likely want their positions known in defending their statutes. This includes footnote # 2 of their Motion to Intervene wherein they argue that earlier Kansas law on the possession of silencers (K.S.A. 21-6301(h)) having to comply with the National Firearms Act as being superseded by SAPA. *See* Dkt. # 56, p. 7, n. 2.

Today, the restrictions on government power foremost in many Americans' minds are likely to be affirmative prohibitions, such as contained in the Bill of Rights. These affirmative prohibitions come into play, however, only where the Government possesses authority to act in the first place. If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate any of the express prohibitions in the Bill of Rights or elsewhere in the Constitution.

Indeed, the Constitution did not initially include a Bill of Rights at least partly because the Framers felt the enumeration of powers sufficed to restrain the Government. As Alexander Hamilton put it, "the Constitution is itself, in every rational sense, and to every useful purpose, a bill of rights." The Federalist No. 84, p. 515 (C. Rossiter ed. 1961). And when the Bill of Rights was ratified, it made express what the enumeration of powers necessarily implied: "The powers not delegated to the United States by the Constitution ... are reserved to the States respectively, or to the people." U.S. Const., Amdt. 10. The Federal Government has expanded dramatically over the past two centuries, but it still must show that a constitutional grant of power authorizes each of its actions. See, *e.g., United States v. Comstock,* 560 U.S. 126, 130 S. Ct. 1949, 176 L.Ed.2d 878 (2010).

The same does not apply to the States, because the Constitution is not the source of their power. The Constitution may restrict state governments—as it does, for example, by forbidding them to deny any person the equal protection of the laws. But where such prohibitions do not apply, state governments do not need constitutional authorization to act. The States thus can and do perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few—even though the Constitution's text does not authorize any government to do so. Our cases refer to this general power of governing, possessed by the States but not by the Federal Government, as the "police power." See, *e.g., United States v. Morrison,* 529 U.S. 598, 618–619, 120 S. Ct. 1740, 146 L.Ed.2d 658 (2000).

"State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States,* 505 U.S. 144, 181, 112 S. Ct. 2408, 120 L.Ed.2d 120 (1992) (internal quotation marks omitted). Because the police power is controlled by 50 different States instead of one national

sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which "in the ordinary course of affairs, concern the lives, liberties, and properties of the people" were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison). The independent power of the States also serves as a check on the power of the Federal Government: "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond v. United States,* 564 U.S. ——, ——, 131 S. Ct. 2355, 2364, 180 L.Ed.2d 269 (2011).

*Nat'l Fed'n of Indep. Bus.,* 132 S. Ct. 2577–78. The general police powers that are reserved for the State of Kansas should control and preclude this federal prosecution.

WHEREFORE, for the above and foregoing reasons, defendant Shane Cox prays this Court sustain this Motion and dismiss this prosecution.

Respectfully submitted,

s/Steven K. Gradert
STEVEN K. GRADERT, Sup. Ct. No. 12781
Assistant Federal Public Defender
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
Email: steve_gradert@fd.org
Counsel for defendant Cox

s/Timothy J. Henry
TIMOTHY J. HENRY, Sup. Ct. No. 12934
Assistant Federal Public Defender
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
Email: tim_henry@fd.org
Counsel for defendant Cox

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2016, I electronically filed the foregoing DEFENDANT'S MOTION TO DISMISS PROSECUTION AS KANSAS' SECOND AMENDMENT PROTECTION ACT ENCOMPASSES A RIGHT NOT DELEGATED TO THE UNITED STATES, BUT RESERVED TO THE STATE UNDER THEIR GENERAL POLICE POWERS, CONSISTENT WITH TENTH AMENDMENT PRINCIPLES with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Richard L. Hathaway
Assistant U.S. Attorney
rich.hathaway@usdoj.gov

Jeffrey A. Chanay
Chief Deputy Attorney General
jeff.chanay@ag.ks.gov

Dwight R. Carswell
Assistant Solicitor General
dwight.carswell@ag.ks.gov

Derek L. Schmidt
Kansas Attorney General
derek.schmidt@ag.ks.gov

Stephen R. McAllister
Solicitor General of Kansas
steve.mcallister@trqlaw.com

Bryan C. Clark
Assistant Solicitor General
bryan.clark@ag.ks.gov

Ian M. Clark
Ariagno, Kerns, Mank & White, LLC
328 N. Main St.
Wichita, KS  67202
iclark@warriorlawyers.com

One copy hand delivered to:

>Shane Cox
>Petrolia, KS

s/Timothy J. Henry
TIMOTHY J. HENRY
Sup. Ct. No. 12934
Assistant Federal Public Defender
301 N. Main, Suite 850
Wichita, KS 67202
Telephone: (316) 269-6445
Fax: (316) 269-6175
Email: tim_henry@fd.org
Counsel for defendant Cox
