# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

      v.               CASE NO.  <u>15-10150-01/02-JTM</u>

SHANE COX and
JEREMY KETTLER,

        Defendants.

---

STATE OF KANSAS,
ex rel. DEREK SCHMIDT,
in his official capacity as Attorney General
of the State of Kansas,

        Intervenor.

---

### GOVERNMENT'S RESPONSE TO DEFENDANT COX'S MOTION TO DISMISS PROSECUTION (Doc. 63) AND RESPONSE TO INTERVENOR STATE OF KANSAS' MOTION SEEKING TO DISMISS THE ABOVE-ENTITLED ACTION (Doc. 66)

APPEAR NOW the United States of America, by and through Richard L.

Hathaway, Assistant United States Attorney, and in response to the motions of Defendant

1

Cox and of the Intervenor, State of Kansas, seeking to dismiss this matter, (Doc. 63, *Def. Co. Mot. to Dismiss*, pp. 1-11; Doc. 66, *Br. of Kansas*, pp. 1-4)[1], respectfully submits the following:

The defendants, either individually or through a third party, namely the Kansas Attorney General, challenge their convictions on three separate grounds: (1) that 26 U.S.C. § 5861 is unconstitutional as an invalid exercise of Congress' power to tax; (2) that § 5861(d) is invalid under Congress' power to regulate interstate commerce; and finally (3) that Kansas' Second Amendment Protection Act (SAPA)[2] is a proper exercise of the police

---

1    Defendant Kettler has joined Defendant Cox's reply to the Intervenor's motion to dismiss.  *See* Docs. 78, 79 and 80.

2    Codified at Kan. Stat. Anno. §§ 50-1201 et seq.   The focus of this litigation is centered largely around Kan. Stat. Anno. § 50-1206 which reads that "[a]ny act, law, treaty, order, rule or regulation of the government of the United States which violates the second amendment to the constitution of the United States, is null, void and unenforceable in the state of Kansas."

In further declaring that Kansas law under SAPA nullifies federal law pertaining to the possession of firearms within the District of Kansas, the Kansas Legislature declared the following:

(a)    The tenth amendment to the constitution of the United States guarantees to the states and their people all powers not granted to the federal government elsewhere in the constitution and reserves to the state and people of Kansas certain powers as they were understood at the time that Kansas was admitted to statehood in 1861. The guaranty of those powers is a matter of contract between the state and people of Kansas and the United States as of the time that the compact with the United States was agreed upon and adopted by Kansas in 1859 and the United States in 1861.

(b)    The ninth amendment to the constitution of the United States guarantees to the people rights not granted in the constitution and reserves to the people of Kansas certain rights as they were understood at the time that Kansas was admitted to statehood in 1861. The guaranty of those rights is a matter of contract between the state and people of Kansas and the United States as of the time that

2

power reserved to the State of Kansas through the Tenth Amendment and thus a valid means of nullifying federal law as it relates to firearms; and, relative to this case, an avenue to void any conviction within the District of Kansas occasioned under 26 U.S.C. § 5861, et seq.   The defendants have recently expanded their arguments to include a claim under the Ninth Amendment to the United States Constitution.   (Doc. 78, *Def. Cox. Resp. Br.*, pp. 1-13.)

More specifically, Defendant Cox (and presumably Defendant Kettler) maintains that his case must be dismissed "on constitutional grounds under the Tenth Amendment to the United States Constitution as the Kansas Second Amendment Protection Act (SAPA) directly conflicts with federal law precluding the present federal prosecution."   (Doc. 63, *Def. Cox Mot. to Dismiss*, p. 1.)[3]   Similarly, the State of Kansas, as intervenor, submits

---

the compact with the United States was agreed upon and adopted by Kansas in 1859 and the United States in 1861.

(c)   The second amendment to the constitution of the United States reserves to the people, individually, the right to keep and bear arms as that right was understood at the time that Kansas was admitted to statehood in 1861, and the guaranty of that right is a matter of contract between the state and people of Kansas and the United States as of the time that the compact with the United States was agreed upon and adopted by Kansas in 1859 and the United States in 1861.

(d)   Section 4 of the bill of rights of the constitution of the state of Kansas clearly secures to Kansas citizens, and prohibits government interference with, the right of individual Kansas citizens to keep and bear arms. This constitutional protection is unchanged from the constitution of the state of Kansas, which was approved by congress and the people of Kansas, and the right exists as it was understood at the time that the compact with the United States was agreed upon and adopted by Kansas in 1859 and the United States in 1861.

3   On November 23, 2016, Defendant Cox submitted a response to the brief filed by the

3

that SAPA is a "constitutional and effective exercise of police power reserved to the State of Kansas by the Tenth Amendment to the United States Constitution," and as a result the United States is prevented from exercising its authority to prosecute violations of federal firearms law within the State of Kansas.   (Doc. 66, *Br. of Kansas*, pp. 1-4.)   For the following reasons the defendants' and intervenor's arguments for dismissal of this case must be denied.

I.      Congressional Taxing Power

Thus far this Court has ruled that precedent "compels a finding that application of § 5861(d) rationally furthers the National Firearms Act scheme for collecting taxes and constitutes a valid exercise of Congress' taxing authority."   *United States v. Cox*, --- F.Supp.3d ---, 2016 WL 2841491 *3 (D. Kan. May 10, 2016); (Doc. 34, *Mem. & Order*, p. 8.)   That opinion remains law of the case and need not be disturbed or revisited.

A.      The National Firearms Act (NFA) Taxing Provisions Are Not Penalty-Based

Not to be dissuaded, however, the defendants switch course on the taxing issue and now submit that "where the applicable provisions of . . . . the Internal Revenue Code lose their character as a taxing provision, and become mere regulatory punishment needing

---

State of Kansas arguing that the Second Amendment controls over the taxing power of Congress and that the Supremacy Clause does not enter into an inquiry between the competing constitutional rights of the Second, Ninth, and Tenth Amendments to the United States Constitution. (Doc. 78, *Def. Cox Resp. Br.*, pp. 1-13.)   Defendant Cox's Ninth Amendment and Supremacy Clause argument expands beyond the Tenth Amendment position raised in his original motion to dismiss wherein he submitted only that "[t]he general police powers that are reserved for the State of Kansas should control and preclude this federal prosecution."   (Doc. 63, *Def. Cox Mot. to Dismiss*, p. 9.)

other enumerated authority . . . . prosecution cannot stand on Congress' taxing authority and must, therefore, find its enumerated authority elsewhere."   (Doc. 63, *Def. Cox Mot. to Dismiss*, pp. 3-4.)   In support of this new defense the defendants rely almost exclusively on the Supreme Court's decision in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. ---, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012).

The defendant's reliance on *National Federation* is misplaced.   *National Federation* addressed *only* the challenge to the "individual mandate" portion of the Patient Protection and Affordable Care Act (commonly referred to as "Obama-Care" or the "ACA"), Pub.L. No. 111-148, 124 Stat. 119 (2010).   132 S.Ct. at 2577.   Under the ACA, Congress enacted the "individual mandate" requiring that non-exempt individuals who forgo minimal essential health coverage must pay a "shared responsibility payment".   *See* 26 U.S.C. § 5000A(a), (b)(1); *United States v. Roszkowski*, 700 F.3d 50, 58 (1st Cir. 2012). As the Court in *Roszkowski* succinctly stated,

> Although the Court eventually upheld the mandate as a valid exercise of Congress's taxing power, the gravamen of the constitutional challenge was that Congress lacked the requisite authority to enact the mandate under the Commerce Clause. In the course of his controlling opinion, Chief Justice Roberts agreed. The problem, he explained, was that the individual mandate "does not regulate existing commercial activity[,] [but] instead compels individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." 132 S.Ct. at 2587. The Chief Justice concluded that such a construction of the Commerce Clause would impermissibly expand its already expansive reach.

700 F.3d at 58 (emphasis in original).[4]

---

4   As remarked on by Judge Lindsay of the Northern District of Texas:

The issue before the Supreme Court in *National Federation* was whether Congress had the power under Article I of the Constitution to enact a provision in the Patient Protection and Affordable Care Act ("PPACA") requiring non-exempted federal income taxpayers to maintain a minimum level of health insurance or otherwise pay a tax penalty. 132 S.Ct. at 2580, 2595–600. The Court upheld the minimum coverage provision as a valid exercise of Congress's taxing power. *Id.* at 2594–600. Five justices separately concluded that the minimum coverage provision was not authorized by Congress's commerce power; however, no single opinion was joined by a majority of the Court on this issue. See *id.* at 2585–91 (Roberts, C.J.); *id.* at 2644–50 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting). Chief Justice Roberts wrote the opinion of the Court upholding the minimum coverage provision under the taxing power, which was joined by Justices Ginsburg, Breyer, Sotomayor, and Kagan. *Id.* at 2594–95. Chief Justice Roberts also wrote a separate opinion expressing the view that Congress could not require individuals to purchase health insurance under its commerce power because the Commerce Clause only gives Congress the power to regulate commerce, not to compel it. *Id.* at 2585–93 (Roberts, C.J.). According to Chief Justice Roberts, the minimum coverage provision did not regulate existing commercial activity— rather, it attempted to regulate inactivity, on the ground that the failure to purchase health insurance affects interstate commerce. *Id.* Chief Justice Roberts, however, only wrote for himself on this issue. In a separate opinion, styled as a "joint dissent," Justices Scalia, Kennedy, Thomas, and Alito similarly argued that the Commerce Clause did not authorize Congress to compel entry into commerce. *Id.* at 2642–50 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting). As indicated above, the dissenters did not join any portion of Chief Justice Roberts's opinion, nor did they agree to the judgment of the Court. *Id.* at 2642–77 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting).

As one court recently noted, there has been considerable debate whether the Chief Justice's Commerce Clause discussion is dicta or binding precedent. *United States v. Henry*, 688 F.3d 637, 641 n. 5 (9th Cir.2012) (citing David Post, Commerce Clause "Holding v. Dictum Mess" Not So Simple, The Volokh Conspiracy, (July 3, 2012, 8:17 AM), http://www.v olokh.com/2012/07/03/commerce -clause-holding-v-dictum-mess-not-so-simple/. While some courts have regarded the Chief Justice's Commerce Clause discussion as the opinion of the Court, others have viewed his opinion as a concurrence. *Compare United States v. Williams*, No. 12–60116–CR–RNS, 2012 WL 3242043, at *3 (S.D.Fla. Aug.7, 2012) (stating that Chief Justice Roberts was "writing for the Court" when discussing Congress's commerce power) with *United States v. Moore*, No. CR–12–6023–RMP, 2012 WL 3780343, at *3 (E.D.Wash. Aug.31, 2012) (finding that in National Federation, Chief Justice Roberts, wrote "a concurring opinion" finding that the Commerce Clause did not authorize the health care statute because Congress cannot regulate inactivity)

*United States v. Spann*, No. 3:12-cr-126-L, 2012 WL 4341799 *2 (N.D.TX Sept. 24, 2012)

What the Court did not address was the regulatory aspects of Title 26 of the United States Code as it relates to firearms; and *National Federation* certainly did not express any intention to overrule the various circuit court decisions upholding Congress's taxing authority under the NFA.   *See Cox*, 2016 WL 2841491 at *2 ("the Tenth Circuit, like all other circuits to address the issue, has found that § 5861 represents a valid exercise of Congress' taxing authority.").   The defendants, however, contend that Congressional taxing powers under Title 26 regulate behavior—here the possession of firearms as permitted by the Second Amendment—such that the regulation is "a mere penalty with the characteristics of regulation and punishment." (Doc. 63, *Def. Cox Mot. to Dismiss*, p. 3 (quoting *National Federation*, 132 S.Ct. at 2599-2600).)   Stated otherwise, the defendants submit that the Second Amendment's right to bear arms cannot be infringed by Congressional taxing authority under Title 26 of the United States Code.   This argument is similarly misplaced as the right to bear arms is not without its limitations, and in furtherance of a well-ordered society Congress may impose restrictions and limitations on the right to bear arms.   *Cf. United States v. Hopkins*, 927 F.Supp.2d 1120, 1169 (D.N.M. 2013); *Dist. of Columbia v. Heller*, 554 U.S. 570, 625 (2008) (Second Amendment only protects the right to own certain weapons and does not protect weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns).

While it is understood that "there comes a time in the extension of the penalizing

---

(unpublished opinion)

features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment," *Magnano Co. v. Hamilton*, 292 U.S. 40, 46 (1922), the Supreme Court has nevertheless "cautioned against invalidating a tax simply because its enforcement might be oppressive or because the legislature's motive was somehow suspect." *Dept. of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 779 (1994). Indeed, "taxes are typically different [from fines, penalties, and forfeitures] because they are usually motivated by revenue-raising, rather than punitive, purposes . . . and neither a high rate of taxation nor an obvious deterrent purpose automatically marks this tax as a form of punishment." *Id*. 779-780.

Because defendant Cox was engaged in the business of manufacturing firearms he was obligated to pay the "special (occupational) tax required by section 5801 for his business." 26 U.S.C. § 5861(a). The revenue raising aspect of § 5801 could not be more clear in this circumstance. Moreover, the law makes no distinction between those who manufacture firearms merely for intra-state versus inter-state purposes. The law impacts *all* individual businesses that engage in the manufacture of firearms. To that end, the defendant cannot rely on SAPA to support an argument that § 5801 is so oppressive that his particular rights under the Second Amendment have been impinged.

That the taxing requirement of § 5861 does not have the hallmark characteristics of a penalty-prone statute is demonstrated by the fact that the tax itself is not conditioned on the commission of a crime. *Kurth Ranch*, 511 U.S. at 781 (Supreme Court has relied on the absence of a condition of criminality to support the conclusion that a particular federal

8

tax was civil rather than criminal).    Thus, defendant Cox need merely pay the required tax if he wishes to engage in the manufacture of firearms, the same as any other individual or company who wishes to do the same.    And, while the NFA was enacted in part to curb the proliferation of especially dangerous weaponry (such as silencers and short-barreled rifles), *Haynes v. United States*, 390 U.S. 85, 87 n. 4 (1968), the mixed-motive nature of the NFA does not then render all of its provisions as solely punitive.    To be sure, the justification for the tax on the firearms defendant Cox manufactured would likely vanish if the taxed activity were completely forbidden, *Kurth Ranch*, 511 U.S. at 781, but the act of manufacturing these weapons is not completely forbidden, it is merely regulated and taxed; and SAPA does not protect the defendant from these federal requirements simply because the State of Kansas believed that Congress had stretched its taxing powers beyond the breaking point relative to the Second Amendment.    Consequently, the defendants' argument on this particular point must fail.

B.    The NFA Does Not Violate Anti-Commandeering Principles

In a separate line of attack, the defendants take the position that the taxing provisions of 26 U.S.C. § 5861 act more as a penalty than a regulation and thus contravene the anti-commandeering principles recognized by the Supreme Court.    (Doc. 63, *Def. Cox Mot. to Dismiss*, pp. 4-5 (citing *National Federation*, 132 S.Ct. at 2602).)    The defendants in turn argue that "the anti-commandeering principle this Court should find is to preclude the federal government from essentially repealing a State law."    (Doc. 63, *Def. Cox Mot. to Dismiss*, p. 5).    The United States submits that this latter argument is somewhat

9

counterintuitive given that the State of Kansas, through SAPA, has itself sought to void application of a federal law, at least to the extent that it operates within the borders of Kansas.   In short, the defendants misapply the anti-commandeering principle in this case.

It is well-understood "that any law that 'commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program' is beyond the inherent limitations on federal power within our dual system."   *National Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 226 (3d Cir. 2013) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 283 (1981)). "Stated differently, Congress 'lacks the power directly to compel the States to require or prohibit' acts which Congress itself may require or prohibit."   *Id*. at 227 (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)).   On the few occasions that the Supreme Court has invalidated federal law on anti-commandeering grounds the Court was clear to express that Congress lacks the authority to commandeer the legislative processes of the States and in turn compel them to enact and enforce a federal regulatory program.   *See New York,* 505 U.S. at 161; *Printz v. United States*, 521 U.S. 898, 935 (1997).

Here, the defendants conflate this principle and suggest that Congress's taxing power under the NFA equates to federal intervention in the wake of SAPA being passed by the Kansas legislature.   (Doc. 63, *Def. Cox Mot. to Dismiss*, p. 7).   This, however, presents a straw-man argument—by creating the controversy through the passage of SAPA—and further presumes that SAPA is validly enacted legislation, which it is not. Even if this Court were to conclude that SAPA is legally sound, the anti-commandeering

10

principle still fails as a matter of law.   Indeed, through the NFA, Congress is not *compelling* the State of Kansas to enact or enforce a federal regulatory program.   Under the NFA, and specifically 26 U.S.C. § 5861, Kansas is not required to enact or enforce a single federal regulatory program or issue any related directives.   More importantly, the anti-commandeering principle does not "suspend[] the operation of the Supremacy Clause on otherwise valid laws." *Nat'l Collegiate*, 730 F.3d at 230.   Simply put, 26 U.S.C. § 5861 is a validly enacted law imposing no affirmative action or obligation on Kansas officials.   Thus, the defendants' reliance on this principle is wildly off the mark and provides no support to their effort in undermining the federal law being scrutinized in this case.

II.   Commerce Clause

Having concluded that Congress' taxing authority provided sufficient reason to deny Defendant Cox's motion to dismiss, this Court elected not to address the "additional argument that § 5861 exceeds Congress' power to regulate interstate commerce." *Cox*, 2016 WL 2841491 at *3.   Had such analysis been necessary, however, well-established precedent unquestionably supports the federal government's right under the Commerce Clause to regulate firearms.

A.   Federal Firearms Regulation

Congress regulates the sale and manufacture of firearms and ammunition through a comprehensive national regulatory scheme put in place by the National Firearms Act (NFA) and the Gun Control Act of 1968 (GCA).   The NFA, enacted in 1934, requires

parties manufacturing or transferring firearms (as defined in the Act) to submit an application for such transactions. *See* 26 U.S.C. §§ 5811-22.   The NFA also requires the registration of such firearms.   26 U.S.C. § 5841.   In enacting the NFA, Congress sought to target "lethal weapons . . . [that] could be used readily and efficiently by criminals or gangsters."   H.R. Rep. No. 1337, 83d Cong., 2d Sess. (1954), 1954 U.S.C.C.A.N. 4017, 4542 (amending provisions for registration and tax on National Firearms Act firearms).

In 1968, Congress enacted the GCA, 18 U.S.C. §§ 921 et seq., to "regulate more effectively interstate commerce in firearms so as to reduce the likelihood that they fall into the hands of the lawless or those who might misuse them"; "assist the States and their political subdivisions to enforce their firearms control laws and ordinances"; and "help combat the skyrocketing increase in the incidence of serious crime in the United States." S. Rep. No. 1866, 89th Cong., 2d Sess. 1, at 1 (1966).

To these ends, the GCA requires that individuals "engag[ing] in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition" receive a license to do so from the Attorney General. 18 U.S.C. § 923(a). The GCA makes it unlawful for anyone other than a licensed firearms importer, manufacturer, or dealer to "engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce." 18 U.S.C. § 922(a)(1)(A)."[5] To become a licensed

---

5 A manufacturer "engage[s] in the business" of manufacturing firearms if he or she "devotes time, attention, and labor to manufacturing firearms as a regular course of trade or

manufacturer or dealer, an individual must submit an application, including a photograph and fingerprints, to the Federal Firearms Licensing Center.    *See* 27 C.F.R. §§ 478.41-.60. If the applicant meets the statutory requirements and pays the required fee (for example, $50 per year for a manufacturer of firearms that are not explosive devices, and $10 per year for a manufacturer of ammunition), the Attorney General grants the license and notifies the chief law enforcement officer in the State. *See* 18 U.S.C. §§ 923(a)(1), (d)(1)(A)-(G), (l); 27 C.F.R. § 478.47.

The GCA also imposes record-keeping and identification requirements on federal firearms licensees.    *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. §§ 478.121-125. Each firearm imported or manufactured must be identified by a serial number, and a mark indicating the model of the firearm, the licensee's name or abbreviation, and the licensee's location. 18 U.S.C. § 923(i); 27 C.F.R. § 478.92(a)(1).    Licensed importers, manufacturers, and dealers may not transfer a firearm to an unlicensed person unless they complete a Firearms Transaction Record (ATF Form 4473). 27 C.F.R. § 478.124.    Form 4473 includes the purchaser's name, date and place of birth, residence address, and a certification from the purchaser that he or she is not a person prohibited from owning a firearm. *Id*. § 478.124(c).    License holders must report the theft or loss of any firearm to both ATF and local law enforcement authorities and must respond to requests by the

---

business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured." 18 U.S.C. § 921(a)(21)(A).

Attorney General made in the course of a criminal investigation for information concerning the disposition of a firearm, 18 U.S.C. § 923(g)(6), (7); moreover, all records must be available at the business premises for ATF compliance inspections. *See* 27 C.F.R. § 478.121(b).

Subject to the direction of the Attorney General, ATF has the authority to investigate criminal and regulatory violations of federal firearms laws.    28 U.S.C. § 599A; *see also* 28 C.F.R. § 0.130.    The record-keeping and identification requirements of the GCA also enable ATF to assist State, local, and foreign law enforcement officials in tracing firearms used in the commission of crimes. *See* S. Rep. No. 1866, 89th Cong., 2d Sess. 1 (1966). Penalties for the violation of federal firearms laws include fine, imprisonment, and forfeiture.    *See* 18 U.S.C. § 924.

B.      Kansas' Second Amendment Protection Act

The Second Amendment Protection Act provides that:

> (a) A personal firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas is not subject to any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program, under the authority of congress to regulate interstate commerce. It is declared by the legislature that those items have not traveled in interstate commerce. This section applies to a firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in the state of Kansas.

> (b)  Component parts are not firearms, firearms accessories or ammunition, and their importation into Kansas and incorporation into a firearm, a firearm accessory or ammunition manufactured and owned in Kansas does not subject the firearm, firearm accessory or ammunition to federal regulation. It is declared by the legislature that such component

14

parts are not firearms, firearms accessories or ammunition and are not subject to congressional authority to regulate firearms, firearms accessories and ammunition under interstate commerce as if they were actually firearms, firearms accessories or ammunition.

(c)   Firearms accessories that are imported into Kansas from another state and that are subject to federal regulation as being in interstate commerce do not subject a firearm to federal regulation under interstate commerce because they are attached to or used in conjunction with a firearm in Kansas.

Kan Stat. Anno. § 50-1204.

To further come within terms of SAPA, "[a] firearm manufactured in Kansas within the meaning of K.S.A. 2014 Supp. 50-1201 through 50-1211, and amendments thereto, must have the words "Made in Kansas" clearly stamped on a central metallic part, such as the receiver or frame."   Otherwise, SAPA does not impose *any* record-keeping or other special licensing requirements on individuals manufacturing firearms and ammunition for sale within Kansas.

### C.   Congressional Authority to Regulate Firearms

"The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail."   *Gonzales v. Raich*, 545 U.S. 1, 29 (2005).   Although SAPA declares that "[a] personal firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas is not subject to any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program, under the authority of congress to regulate interstate commerce,"

individuals in Kansas must nevertheless comply with federal firearms regulations. To that end, Defendants' claim requires this Court to conclude that Congress lacked constitutional authority to regulate the intrastate manufacture and sale of firearms and ammunition. Such a claim, however, is wholly without merit as the federal firearms laws challenged in this case were enacted as valid exercises of Congress's Commerce power.

The Constitution grants to Congress the power to "regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, and to "make all Laws which shall be necessary and proper" to the execution of that power, *id*. cl. 18. This grant of authority allows Congress not only to regulate interstate commerce but also to address other conduct that "substantially affect[s] interstate commerce." *Raich*, 545 U.S. at 16-17. In assessing those substantial effects, Congress's focus is necessarily broad. Congress may consider the aggregate effect of a particular form of conduct, and need not predict case by case whether and to what extent particular individuals in the class will contribute to those aggregate effects. *Id*. at 22.

Moreover, in reviewing the validity of legislation enacted under the Commerce power, a court's task "is a modest one." *Ibid*. The court "need not determine" whether the regulated conduct, "taken in the aggregate, substantially affect[s] interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Ibid*.

The validity—rather invalidity—of SAPA follows logically from the decision in *Raich*. Plaintiffs in *Raich* asserted that Congress could not regulate their possession of marijuana grown at home solely for personal medical use as sanctioned by state law. *Id*.

The Supreme Court concluded that the Controlled Substances Act properly applied to a homegrown product that would not be sold even in the intra-state market.   In reaching its conclusion, the Court relied on *Wickard v. Filburn*, 317 U.S. 111 (1942), which upheld federal regulation of home-grown wheat intended for home consumption. The Court explained that Congress could regulate intra-state activity, "if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Raich*, 545 U.S. at 18.

Relatedly, and following the Supreme Court's decision in *Raich*, the United States Court of Appeals for the Ninth Circuit in *United States v. Stewart*, 451 F.3d 1071 (9th Cir. 2006), held that the federal ban on possession of machineguns properly applies to a machinegun assembled at home that is not intended for sale.   The Ninth Circuit court held that "Congress could have rationally concluded that homemade machineguns would affect the national market," explaining that "[t]he market for machineguns is established and lucrative, like the market for marijuana," and the "'regulation of intrastate incidents of transfer and possession is essential to effective control of the interstate incidents of such traffic.'" 451 F.3d at 1077 (quoting *United States v. Rambo*, 74 F.3d 948, 952 (9th Cir. 1996)). *See also Huddleston v. United States*, 415 U.S. 814, 833 (1974) ("Congress intended, and properly so, that §§ 922(a)(6) and (d)(1) [of the Gun Control Act] … were to reach transactions that are wholly intrastate . . . on the theory that such transactions affect interstate commerce.") (quotation marks omitted); *United States v. Petrucci*, 486 F.2d 329, 331 (9th Cir. 1973) ("Illegal intrastate transfer of firearms is part of a pattern which affects

17

the national traffic and Congress can validly enact a comprehensive program regulating all transfers of firearms.").

To be sure, the intrastate manufacture and commercial sale of firearms and ammunition substantially affects the interstate firearms market.   Thus, federal firearms laws regulate the manufacture, distribution, and acquisition of firearms and ammunition. Those laws impose requirements on federally-licensed firearms dealers and manufacturers at the point at which a weapon enters the stream of commerce, and regulate commercial activities. *See Huddleston*, 415 U.S. at 825.   And, there can be no doubt that intrastate firearms transactions substantially affect the interstate market for firearms, both legal and illicit.   Consequently, because a market for illicit firearms exists nationwide, a "gaping hole" in federal firearms regulation would be created if Congress lacked authority to regulate firearms and ammunition manufacture and sale until a firearm or ammunition crossed state lines.   *Raich*, 545 U.S. at 22.   Any argument to the contrary would deprive Congress of authority to regulate the intrastate sale of firearms and ammunition in any state, not merely in Kansas or in the other States that have enacted laws similar to SAPA.

Importantly, the Ninth Circuit settled the very same issue presented here in the case of *Montana Shooting Sports Assoc. v. Holder*, 727 F.3d 975 (2013), *cert. denied*, 134 S.Ct. 955 (2014), where the Court, relying on *Raich*, held that Congress's commerce power extends to the manufacture and sale of purely intra-state firearms manufactured for sale. *Id*. at 981.   The Court reasoned such regulation is proper even if such firearms were not meant for sale outside of the respective state given that "Congress could rationally conclude

that unlicensed firearms would make their way into the interstate market," and that merely stamping the firearm with a "Made in Montana" marking does not change the result as "Congress might reasonably determine that a 'Made in Montana' stamp will not deter those seeking to purchase unregistered firearms in the interstate black market." *Id*. at 982 (citing *Stewart*, 451 F.3d at 1077-78).

The court ultimately held that "Congress could have rationally concluded that the manufacture of unlicensed firearms, even if initially sold only within the State of Montana, would in the aggregate substantially affect the interstate market for firearms . . . [and that] because [Montana Law] purports to dictate to the contrary . . . it is necessarily preempted and invalid." *Id*. at 982-983.   Given that Montana's law and SAPA are materially indistinguishable,[6] the same preemption and invalidation of SAPA is appropriate here.

III.    SAPA and the United States Constitution

The defendants and intervenor maintain that SAPA "is a constitutional and effective exercise of the police power reserved to the State of Kansas by the Tenth Amendment to the United States Constitution."   (Doc. 66, *Br. of Kansas*, pp. 1-4; Doc. 78, *Def. Cox.*

---

6 Kansas modeled its legislation after the Montana Firearms Freedom Act (MFFA) enacted in 2009. See Mont. Code. Ann. § 30-20-104. Seven states, besides Montana and Kansas, have also enacted laws similar to the MFFA and SAPA. *See* Alaska Stat. § 44.99.500 (2010) Ariz.Rev.Stat.Ann. § 13-3114 (2010); Idaho Code Ann. § 18-3315A (2010); S.D. Codified Laws §§ 37-35-1 to -5(2010); Tenn.Code.Ann. §§ 4-54-101 to - 106 (2009); Utah Code Ann. §§ 53-5b-101 to -202 (2010); Wyoming Stat.Ann. §§ 6-8-402 to -406 (2010). These laws vary to some degree in language but remain consistent on the overall theme, namely that the federal government has no right to regulate the intrastate manufacture and ownership of firearms. Only two states, Kansas and Wyoming, establish criminal penalties for violating their respective act. Kansas law states that a violation shall be a level 10 nonperson felony.  Kan. Stat. Anno. § 50-1207. Wyoming law states that the penalty shall be a misdemeanor.

19

*Resp. Br.*, pp. 1-13.)   Defendants Cox and Kettler, however, expand the argument to include an additional constitutional defense, maintaining that the Second Amendment's right to bear arms is a personal right embodied in the Ninth Amendment.   Doc. 78, *Def. Cox. Resp. Br.*, pp. 3-4.)   For the following reasons, the arguments that SAPA is fully supported by the Ninth and Tenth Amendment are unavailing.

      A.    <u>The Tenth Amendment</u>

The Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.   Under Supreme Court precedent, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. United States*, 505 U.S. 144, 156 (1992).   "It is in this sense that the Tenth Amendment 'states but a truism that all is retained which has not been surrendered.'" *Id.* (quoting *United States v. Darby*, 312 U.S. 100, 124 (1941)).   As the Tenth Circuit has explained, "'if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment.'"   *United States v. Hampshire*, 95 F.3d 999, 1004 (10th Cir. 1996) (quoting *United States v. Mussari*, 95 F.3d 787, 791 (9th Cir. 1996)); *see also United States v. Comstock*, 560 U.S. 126, 144 (2010) ("The powers delegated to the United States by the Constitution include those specifically enumerated powers listed in Article I along with the implementation authority granted by the Necessary

20

and Proper Clause.   Virtually by definition, these powers are not powers that the Constitution 'reserved to the States.'").   Thus, because Congress may regulate the intrastate manufacture and sale of firearms under an enumerated power in the Constitution, namely the Commerce Clause, neither the defendants nor intervenor can establish a Tenth Amendment violation.

Intervenor's reliance on *Printz v. United States*, 521 U.S. 898 (1997), is wholly misplaced.   *See Attach.* to Doc. 66, *Br. of Kansas*, pp. 2.   In *Printz*, local officials challenged the constitutionality of that Brady Act's interim provisions requiring state law enforcement officers to determine whether proposed firearms transactions were lawful. *See Printz*, 521 U.S. at 903-04.   The Supreme Court explained that "the Brady Act purports to direct state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme."   *Id.* at 904.   These provisions thus amounted to unconstitutional "commandeering" of state officers by the Federal government.   *See id.* at 914, 925.

By contrast, and as detailed above, the laws challenged in this case are federal laws "to be implemented by federal authorities"; they do "not attempt to force the states or state officers to enact or enforce any federal regulation." *United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000).   No Kansas official is commandeered under federal firearms laws that regulate the manufacture and sale of short-barreled rifles and / or silencers by private parties; and again, the defendants cannot rely on a straw-man argument that because SAPA now exists Kansas officials are somehow commandeered.

B.   Supremacy Clause

For similar reasons the defendants and intervenor cannot overcome the role the Supremacy Clause plays in this very case.    Indeed, as this very Court plainly held:

> Based on the Supremacy Clause of the United States Constitution, federal law "shall be supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. IV. It is well established that federal law may trump state law or constitution. *M'Colluch v. Maryland*, 17 U.S. (4 Wheat.), 316, 4 L.Ed 579 (1819). Federal circuits have permitted the federal government to designate crimes which that state has not designated. *United States v. Napier*, 233 F.3d 394, 404 (6th Cir.2000); *United States v. Minnick*, 949 F.2d 8 (1st Cir.1991). Thus, based upon the supremacy of federal law over state law, it was proper for Congress to enact 18 U.S.C. § 922(g)(1) dealing with both firearms and ammunition, even though a state has not made them illegal to possess.

*United States v. Baker*, Cr. No. 06-10129-JTM, 2006 WL 2092467 *1 (D.Kan. July 27, 2006 (Mem. & Order); *see also Raich*, 545 U.S. at 29 ("[t]he Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail."); *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 211 (1824) (holding that state laws that are inconsistent with federal laws must yield).    SAPA is in direct contravention of federal law and must therefore yield.

Addressing the exact same arguments in the *Montana Shooting* case, the lower court there held as follows:

> The Act [MFFA] is in clear conflict with Federal firearms laws, including the Gun Control Act and National Firearms Act. The Act purports to exempt Montana small arms manufacturers and dealers, whose activities are confined within the state of Montana, from requirements imposed by federal law. In fact, it is the conflict between these state and federal statutory schemes that prompted this litigation. Because the Federal firearms laws are a valid exercise of Congressional power under the Commerce Clause, even as applied the

Plaintiffs' intrastate activities, those federal laws prevail to the extent the Act conflicts with them.

To the extent Plaintiffs argue this results in a Tenth Amendment violation, they are mistaken. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the States respectively, or to the people." U.S. Const. amend X. The Tenth Amendment thus reserves to the states those powers not specifically delegated to the federal government.

Where, as here, a federal statute "is within the powers granted to Congress under the Commerce Clause, it cannot constitute an exercise of power reserved to the states." *Columbia River Gorge United—Protecting People and Property v. Yeutter*, 960 F.2d 110, 114 (9th Cir.1992). If Congress has acted within its power under the Commerce Clause, "the Tenth Amendment expressly disclaims any reservation of power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992). In other words, a valid exercise of Congress' Commerce Clause power is not a violation of the Tenth Amendment. *See e.g. United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir.1995); *Garcia v. San Antonio Metropolitan Trans. Auth.*, 469 U.S. 528 (1985). Because federal firearms laws are a valid exercise of Congress' power under the Commerce Clause as applied to the intrastate activities contemplated by the Act, there is no Tenth Amendment violation in this case.

*Montana Shooting Sports Ass'n v. Holder*, No. CV-09-147-DWM-JCL, 2010 WL 3926029

*22-23 (D.Mont. Aug. 31, 2010); *Montana Shooting Sports Ass'n v. Holder*, No. CV-09-

147-DWM-JCL, 2010 WL 3926029 *22-23 (D.Mont. Sept. 29, 2010) (adopting findings

and recommendations of magistrate).

Again, the Montana Firearms Freedom Act is materially indistinguishable from the

Second Amendment Protection Act and thus the above holdings are persuasive reason to

similarly find no Tenth Amendment violation in this case.

C.     The Ninth Amendment

Again, defendants Cox and Kettler argue that the Second Amendment's right to bear

arms is a personal right embodied in the Ninth Amendment.   (Doc. 78, *Def. Cox. Resp. Br.*, pp. 3-4.)   Intervenor submits a Ninth Amendment argument, but only in passing. (Doc. 66, *Br. State of Kansas*, p. 3) ("The intent of [SAPA] is to reaffirm the constitutional limits on Congress's authority to regulate firearms, firearms accessories and ammunition under the Constitution and thereby protect the rights reserved to Kansas and its citizens under the . . . . Ninth Amendment . . . .").   For the following reasons, any argument implicating the Ninth Amendment must similarly fail.

The Second Amendment to the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."   U.S. Const. Amend. II.   In the seminal case of *Heller*, the Supreme Court held that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."   554 U.S. at 592.[7]   And, while *Heller* recognized an individual's right to keep and bear arms, it provided that the right "was not unlimited."   *Id*. at 595.   ("[W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any* sort of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any* purpose.") (emphasis in original).

The Ninth Amendment provides that "enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people."   U.S.

---

7   In the case of *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court extended the decision in *Heller* to the States.

Const. Amend. IX.

The Ninth Amendment, quite obviously, does not establish any individual right to bear arms, and federal courts have regularly held as such.   Indeed, the Tenth Circuit's decision in *United States v. Baer*, 235 F.3d 561 (10th Cir. 2000), forecloses this very issue. There, the Court unequivocally rejected any argument that the Ninth Amendment encompasses "an unenumerated, fundamental, individual right to bear firearms." *Id*. at 564 (quoting *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1125 (9th Cir. 1996)); *see also United States v. Broussard*, 80 F.3d 1025, 1041 (5th Cir. 1996) (finding no rational argument for the assertion that the right to possess weapons is among the rights reserved to the citizens of the U.S. under the Ninth Amendment); *Quilici v. Village of Morton Grove*, 695 F.2d 261, 271 (7th Cir. 1982) ("Appellants may believe the ninth amendment should be read to recognize an unwritten, fundamental, individual right to own or possess firearms; the fact remains that the Supreme Court has never embraced this theory."); *Ross v. Federal Bureau of Alcohol, Tobacco, and Firearms*, 807 F.Supp.2d 362, 372 (D. Maryland 2011); *United States v. Finnell*, 256 F.Supp.2d 493, 498 (E.D.Va. 2003)

The Supreme Court's decision in *Heller* does nothing to undermine these decisions. Thus, the defendant's, and intervenor's arguments concerning the Ninth Amendment must be denied.[8]

---

8   Within his Ninth Amendment claim, Defendant Cox makes the argument that the firearms in question in this case, namely silencers and a short-barreled rifles, are now within the protections of the Second Amendment as expressed in *Heller*.   (Doc. 78, Def. Cox Resp. Br, pp. 4-5).   The defendant's reading of *Heller* is simply incorrect as the Court's decision clearly does

IV.     The Doctrine of Nullification

While the defendants and intervenor have not, and presumably will not, candidly admit that SAPA is nothing short of an attempt to nullify federal law, that is exactly what SAPA is intended to do.   Without question, Kansas is not the first state, and likely not the last, to pass legislation intended to nullify federal firearms laws.   However, as with past attempts by states to nullify federal law, SAPA must likewise be held as an impermissible legislative act by the State of Kansas.

Nullification was, in part, born out of the pre-Civil War days when rebellious states refused to recognize enforcement of federal law within their borders.   *Lopez v. Heckler*, 713 F.2d 1432, 1441 (9th Cir. 1983) (Pregerson, J., concurring); *Jaffee v. United States*, 663 F.2d 1226, 1261 n. 35 (3d Cir. 1981).   Nullification reached its zenith in the wake of

---

not countenance the possession of these weapons.   To be sure, the Court plainly recognized and upheld the prohibition on the carrying of "dangerous and unusual weapons," 554 U.S. at 627, and that the protections of the Second Amendment do not extend to "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."   *Id*. at 625; *see also United States v. Hatfield*, 376 Fed.Appx. 706, 707 (9th Cir. 2010) (reaffirming that sawed-off shotguns have few if any legitimate uses and are inherently dangerous); *Friedman v. City of Highland Park, Illinois*, 784 f.3d 406, 408 (7th Cir. 2015) ("The [*Heller*] Court took from [*United States v.*] *Miller* the rule that the Second Amendment does not authorize private persons to possess weapons such as machine guns and sawed-off shotguns that the government would not expect (or allow) citizens to bring with them when the militia is called to service."); *United States v. Chester*, 628 F.3d 673, 678-79 (4th Cir. 2010) (Following *Heller*, holding that a citizen's right to carry or keep sawed-off shotgun does not come within the ambit of the Second Amendment).   To that same end, *Heller* does not support the possession of silencers, a less common and arguably more dangerous weapon.   *See United States v. McCartney*, 357 Fed.Appx. 73, 76 (9th Cir. 2009) (unpublished opinion*); United States v. Perkins*, No. 4:08CR3064, 2008 WL 4372821 *4 (D.Neb. Sept. 23, 2008) ("silencers 'are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use'"); *United States v. Garnett*, No. 05-CR-20002-3, 2008 WL 2796098 *4 (E.D. Mich. July 18, 2008) (Nothing in *Heller* casts doubt on the constitutionality of federal regulations over silencers).

the Supreme Court's momentous decision in *Brown v. Board of Education*, 394 U.S. 294

(1955).   *See e.g. Wright v. Council of City of Emporia*, 442 F.2d 588, 594 (1971) (Winter

J., dissenting and concurring specially) (citing the "evasive tactics" pursued to avoid the

mandate of *Brown*); *see also* Keely N. Kight, *Back to the Future: The Revival of the Theory

of Nullification*, 65 Mercer L. Rev. 521 (2014) (tracing the history of nullification laws to

the present day attempts at nullifying federal firearms laws by Kansas and other states).

Nullification is a ruinous doctrine that "has attracted little attention since 1833 and

none since Appomatox."   *Dietz v. State of Arkansas*, 709 F.Supp. 902, 904 (E.D. Ark.

1989); *Little Rock School Dist. v. Pulaski County Special School Dist. No. 1*, 584 F.Supp.

328, 330 (E.D. Ark. 1984) (remarking that after *Brown*, Arkansas disinterred the

discredited doctrine of nullification through the passage of Amendment 44 to the Arkansas

Constitution).   Such is the case here; and the Kansas legislature's direct attempt to prevent

the enforcement of federal firearms laws within its borders through the passage of SAPA

should now be given its proper label—nullification—and as history has shown such

attempts at nullification have no place in our Republic.

The Second Amendment Protection Act does not protect the defendants in this case,

and the arguments by both, and through the intervenor, must therefore be denied in their

entirety.

Conclusion

The Second Amendment Protection Act unquestionably runs counter to Federal

firearms law.   Consequently, and apart from simply denying the defendants and

27

intervenor relief, this Court must deem SAPA preempted and invalid. *Montana Shooting Sports Ass'n*, 727 F.3d at 983.


Respectfully submitted,

THOMAS E. BEALL
United States Attorney
District of Kansas


By:     /s/  *Richard L. Hathaway*

RICHARD L. HATHAWAY, Ks. Bar. No. 07767
Assistant United States Attorney
290 Carlson Federal Bldg.
444 SE Quincy St.
Topeka, KS 66683
Ph: 785.295.2850 (Office)
Fax: 785.295.2853
Richard.Hathaway@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of December, 2016, I electronically filed the foregoing Response with the Clerk of the Court by using the CM/ECF system, which will send an electronic copy of the same to the following:

Derek L. Schmidt
Office of Attorney General - Kansas
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
785-296-2218
derek.schmidt@ag.ks.gov

Dwight R. Carswell
Office of Attorney General - Kansas
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
785-368-8410
dwight.carswell@ag.ks.gov

Jeffrey A. Chanay
Office of Attorney General - Kansas
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
785-368-8435
785-291-3767 (fax)
jeff.chanay@ag.ks.gov

Bryan C. Clark
Office of Attorney General - Kansas
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
785-368-7020
bryan.clark@ag.ks.gov

Stephen R. McAllister
Thompson Ramsdell Qualseth & Warner, PA
333 West 9th Street, Suite B
PO Box 1264
Lawrence, KS 66044-2803
785-841-4554
785-841-4499 (fax)
steve.mcallister@trqlaw.com

Ian M. Clark
Ariagno, Kerns, Mank & White
328 North Main
Wichita, KS 67202
316-265-5511
316-265-4433 (fax)
iclark@warriorlawyers.com

David J. Freund
Office of Federal Public Defender - Wichita
850 Epic Center
301 North Main Street
Wichita, KS 67202
316-269-6445
316-269-6175 (fax)
david_freund@fd.org

Steven Kent Gradert
Office of Federal Public Defender - Wichita
850 Epic Center
301 North Main Street
Wichita, KS 67202
316-269-6445 ext 6298
316-269-6175 (fax)
steve_gradert@fd.org

Timothy J. Henry
Office of Federal Public Defender - Wichita
850 Epic Center
301 North Main Street
Wichita, KS 67202
316-269-6265
316-269-6175 (fax)
tim_henry@fd.org


By:    /s/  *Richard L. Hathaway*

RICHARD L. HATHAWAY, Ks. Bar. No. 07767
Assistant United States Attorney